363 F.3d 916
 Lorna A. OLSEN, Plaintiff-Appellant,
v.
IDAHO STATE BOARD OF MEDICINE; Idaho State Board of Medicine Board of Professional Discipline; Michael E. Estess, in his official capacity as member of the Idaho State Board of Professional Discipline, and in his individual and personal capacity; Jane Doe Estess, in her individual and personal capacity; Darlene Thorsted, Executive Director of the Idaho State Board of Medicine in her official capacity, and in her individual and personal capacity; John Doe Thorsted, in his individual and personal capacity; Jane Bennett-Munro, M.D., in her official capacity and in her individual and personal capacities; John Doe Munro, in his individual and personal capacity; Michael E. Bell, M.D., in his official capacity and in his individual and personal capacities; Jane Doe Bell, in her individual and personal capacities; Donald R. Bjornson, in his official capacity and in his individual and personal capacities; Jane Doe Bjornson, in her individual and personal capacities; Kathleen Brodie, in her official capacity and in her individual and personal capacities; John Doe Brodie, in his individual and personal capacities; James R. Swartley, M.D., in his official capacity and in his individual and personal capacities; Jane Doe Swartley, in her individual and personal capacities; David Anderson, M.D., in his official capacity and in his individual and personal capacities; Jane Doe Anderson, in her individual and personal capacities; Nancy Kerr, in her official capacity and in her individual and personal capacities; John Doe Kerr, in his individual and personal capacities; Cathy Delany, in her official capacity and in her individual and personal capacities; John Doe Delany, in his individual and personal capacities; Jean Uranga, in her official capacity and in her individual and personal capacities; John Doe Uranga, in his individual and personal capacities, Defendants-Appellees.
 No. 02-35796.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 7, 2003.
 Filed April 7, 2004.
 
 COPYRIGHT MATERIAL OMITTED Brett M. Hager, Sanders & Parks, P.C., Phoenix, AZ, for the plaintiff-appellant.
 James D. Carlson, Deputy Attorney General, Boise, ID, for the defendants-appellees.
 David R. Lombardi, Givens Pursley LLP, Boise, ID, for defendant-appellee Jean Uranga.
 Emily A. Durkee, Givens Pursley LLP, Boise, ID, for defendant-appellee Jean Uranga.
 Appeal from the United States District Court for the District of Idaho; Mikel H. Williams, Magistrate, Presiding. D.C. No. CV-01-00269-MHW.
 Before: TROTT, FISHER, and GOULD, Circuit Judges.
 TROTT, Circuit Judge:
 
 
 1
 Lorna A. Olsen brought this action against the Idaho State Board of Medicine ("Board"), the Idaho State Board of Professional Discipline ("BOPD"), the individual members and counsel of the Board and BOPD, and the Executive Director of the Board (collectively "appellees"), alleging both state law and federal statutory and constitutional violations. Specifically, Olsen alleges that beginning in 1996, appellees engaged in a protracted administrative process motivated by religious discrimination, which precluded the reinstatement of her physician assistant's license, and thereby deprived her of her equal protection and due process rights, as secured by the United States Constitution. Accordingly, Olsen brought suit, asserting claims under 42 U.S.C. §§ 1983, 1985 and Idaho state law.
 
 
 2
 The district court granted appellees' motion for summary judgment and dismissed Olsen's claims. Because the district court correctly ruled that appellees are functionally comparable to judges and prosecutors and are accordingly entitled to the protections of absolute immunity for their quasi-judicial and quasi-prosecutorial acts, we affirm. We conclude also that none of appellees' alleged administrative acts supports a cognizable § 1983 claim and that Olsen's claim under § 1985 fails to allege sufficient facts to support a cause of action for conspiracy. Finally, we conclude that Olsen cannot state a claim under the Idaho Free Exercise of Religion Act because the Idaho legislature did not intend the Act to apply retroactively to conduct occurring prior to the statute's enactment.
 
 I. BACKGROUND
 
 3
 Lorna Olsen registered with the Idaho State Board of Medicine as a physician assistant in 1993.[1] As required by applicable Idaho regulations, Olsen practiced under a supervising physician until 1996, when Olsen's registration was terminated.[2] That termination arose out of Olsen's overdose on a combination of prescription and over-the-counter drugs on January 7, 1996. Olsen's supervising physician then withdrew sponsorship, automatically terminating Olsen's registration, as mandated by then-applicable Idaho regulations. See IDAPA 22.01.03.037.03 (1996) ("[U]pon termination of an employment relationship between a physician's assistant and his supervising physician, the Board shall be notified and the registration shall be automatically canceled, if written notice of a new employment relationship ... [is] not received and approved by the Board.") (emphasis added).[3]
 
 
 4
 Following her overdose and while Olsen was still in the hospital, a representative for the Board encouraged her to attend a three-day, in-patient medical evaluation to determine if she had a substance abuse condition. She submitted to the evaluation, the results of which are still disputed. Thereafter, on May 31, 1996, the Board issued a formal disciplinary complaint against Olsen arising out of her improper drug use. Appellee Jean Uranga ("Uranga"), counsel for the Board and BOPD, then informed Olsen by letter that she would need to secure a new supervising physician before any request for reinstatement could be processed. The BOPD initiated a disciplinary action by filing a formal complaint against Olsen on September 19, 1996, and a subsequent amended complaint in December 1996, alleging, inter alia, that Olsen improperly continued to practice as a physician assistant and to prescribe medication even after her registration had been canceled. On February 13, 1997, Olsen and the BOPD settled by entering into a Stipulation and Order. In that Stipulation and Order, the parties agreed that Olsen's license could be reinstated "subject to the rules governing all physician assistants" if she submitted to random drug testing, monitored by her supervising physician.
 
 
 5
 Olsen subsequently applied for a license to practice in Utah. Though Utah's licensing authorities possessed copies of the Idaho complaint and the Stipulation and Order, Olsen alleges that the Executive Director of the Board, appellee Darlene Thorsted ("Thorsted"), verbally informed the executive director of the Utah Board of Medicine that Olsen was guilty of the charges detailed in the Idaho complaint. Olsen asserts that this exchange between Utah and Idaho authorities delayed her licensing in Utah until 2002.
 
 
 6
 In September 1998, Olsen also applied and interviewed for a physician assistant position in Twin Falls, Idaho. In November 1998, Olsen attempted to re-register with the Board, requesting that her license to practice in Idaho be reinstated. In conjunction with this request, Olsen appeared before the BOPD for a personal interview on January 9, 1999. Olsen alleges that during this interview she was asked inappropriate questions about her religion and lifestyle. In a certified letter dated February 4, 1999, Thorsted informed Olsen that the Board intended to deny her request for reinstatement and invited her to request an evidentiary hearing. Olsen did request such a hearing, by letter dated February 26, 1999, which included a request for copies of her public records. In connection with that records request, Uranga sent Olsen's attorney a billing statement for $617.50 on July 13, 1999.
 
 
 7
 The Board appointed an independent hearing officer to review Olsen's request for reinstatement. That officer's recommendation to the Board concluded that Olsen was not entitled to the requested hearing because Olsen had "no existing license" and therefore "neither the Medical Practices nor the Rules and Regulations of the Board nor the Administrative Procedures Act confer [sic] any right to any hearing to Ms. Olsen regarding her November 12, 1998 application for reinstatement." Specifically, the hearing officer found that there was no license to reinstate because either 1) her license had automatically terminated, under applicable regulations, when her supervising physician withdrew in 1996 or, in the alternative, 2) her license had lapsed for failure to submit the required annual renewal application or re-register within two years following cancellation as allowed by applicable Board rules. See IDAPA 22.01.03.051.02-.03 (1998).[4]
 
 
 8
 The Board then issued a final order on August 12, 1999, denying Olsen's application for reinstatement and adopting the hearing officer's second rationale that her license had lapsed for failure to file the annual renewal application. Specifically, the Board found that because Olsen "did not request renewal of her license within the two year period of the date her license was last in effect (June 30, 1996), she is not entitled to reinstatement of her license ... nor is she entitled to a hearing on the issue." Olsen filed a motion for reconsideration, which the Board denied on September 10, 1999.
 
 
 9
 Olsen then appealed the Board's denial of reinstatement by filing a lawsuit in Idaho state court, requesting judicial review of the Board's decision as well as both injunctive relief and a declaratory judgment. On May 19, 2000, the state court dismissed all claims for lack of subject matter jurisdiction, except the claim for judicial review of the Board's decision. Olsen voluntarily dismissed that remaining claim. Olsen also filed a new application for a license in late 1999, the processing of which has not been completed by the Board, owing to Olsen's failure to respond to information requests sent by the Board on December 29, 1999.
 
 
 10
 Olsen filed the instant action on February 2, 2001, in Idaho State court. After the case was removed to United States District Court for the District of Idaho, Olsen filed an amended complaint on February 5, 2001. That operative complaint avers that several alleged actions by appellees during the process by which Olsen attempted to reinstate her license violated her constitutional rights. Specifically, she asserts that appellees' decisions and actions revoking and denying her license were motivated by their sentiments about her membership in the Mormon Church and her lifestyle choices in that regard. The district court dismissed each of Olsen's claims, concluding that appellees are entitled to absolute immunity for their quasi-judicial and quasi-prosecutorial conduct; that those allegations which fall outside the scope of such immunity were either precluded by the statute of limitations or not sufficient to constitute a viable constitutional claim; that the complaint failed to allege sufficient facts of a conspiracy to violate her constitutional rights; and that the Idaho Free Exercise of Religion Act did not apply retroactively to her claims. Olsen appeals that decision.
 
 II. STANDARD OF REVIEW
 
 A. District Court's Decision
 
 
 11
 The district court reviewed and relied on materials outside the pleadings, and it therefore treated appellees' motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b) as motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Olsen contends that this was improper.
 
 
 12
 When "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. Pro. 12(c). We do not require strict adherence to formal notice requirements. Rather, we examine the record in each case "to determine whether the party against whom summary judgment was entered was `fairly apprised that the court would look beyond the pleadings and thereby transform the 12(b) motion to dismiss into one for summary judgment.'" Garaux v. Pulley, 739 F.2d 437, 439 (9th Cir.1984) (quoting Mayer v. Wedgewood Neighborhood Coalition, 707 F.2d 1020, 1021 (9th Cir.1983) (per curiam)). We have previously held that "a `represented party who submits matters outside the pleadings to the judge and invites consideration of them has notice that the judge may use them to decide a motion originally noted as a motion to dismiss, requiring its transformation to a motion for summary judgment.'" San Pedro Hotel Co. v. City of Los Angeles, 159 F.3d 470, 477 (9th Cir.1998) (quoting Grove v. Mead School Dist. No. 354, 753 F.2d 1528, 1533 (9th Cir.1985)). In this case, not only was much of the extra-complaint material relied on by the court attached to appellee Uranga's Answer to the Amended Complaint, but Olsen herself included extraneous material in her opposition to appellees' motions to dismiss. Accordingly, we find that Olsen had sufficient notice of the district court's decision to treat the motions to dismiss as motions for summary judgment.
 
 
 B. Standard of Review
 
 
 13
 Olsen appeals from the district court's order granting summary judgment for appellees. A grant of summary judgment is reviewed de novo. United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003). We must determine, viewing the evidence in the light most favorable to Olsen, the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. Id. We may affirm on any ground supported by the record. Simo v. Union of Needletrades, 322 F.3d 602, 610 (9th Cir.2003). The district court dismissed all of Olsen's § 1983 claims on grounds of absolute immunity and the applicable statute of limitations. The determination of immunity is a question of law, which we review de novo. Buckles v. King County, 191 F.3d 1127, 1132 (9th Cir.1999). The district court's dismissal based on statute of limitations grounds is reviewed de novo. Mann v. Am. Airlines, 324 F.3d 1088, 1090 (9th Cir.2003).
 
 III. ANALYSIS
 
 A. 42 U.S.C. § 1983 Cause of Action
 
 
 1. Absolute Immunity
 
 
 14
 Absolute immunity is generally accorded to judges and prosecutors functioning in their official capacities. Stump v. Sparkman, 435 U.S. 349, 364, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (holding that state circuit judge is immune from suit for all actions within his jurisdiction); Imbler v. Pachtman, 424 U.S. 409, 430-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (holding that state prosecutor had absolute immunity for initiation and pursuit of criminal prosecutions, including presentation of case at trial). This immunity reflects the long-standing "general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." Bradley v. Fisher, 13 Wall. 335, 347, 20 L.Ed. 646 (1871).
 
 
 15
 Recognizing these considerations, courts have extended the protections of absolute immunity to qualifying state officials sued under 42 U.S.C. § 1983. Miller v. Gammie, 335 F.3d 889, 895-96 (9th Cir.2003) (explaining that though § 1983 does not include a defense of immunity, "the Supreme Court has recognized that when Congress enacted § 1983, it was aware of a well-established and well-understood common-law tradition that extended absolute immunity to individuals performing functions necessary to the judicial process" (citing Forrester v. White, 484 U.S. 219, 225-26, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (superseded by statute))); Buckley v. Fitzsimmons, 509 U.S. 259, 268-69, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Indeed, judicial immunity from § 1983 suits is "viewed as necessary to protect the judicial process." Burns v. Reed, 500 U.S. 478, 485, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Likewise, the protections of absolute immunity accorded prosecutors reflect the "`concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.'" Id. (quoting Imbler, 424 U.S. at 423, 96 S.Ct. 984).
 
 
 16
 Under certain circumstances, absolute immunity is also extended to agency representatives performing functions analogous to those of a prosecutor or a judge. Miller, 335 F.3d at 898. Such immunity assures the independent functioning of executive officials acting in a quasi-judicial capacity, thereby ensuring that they can exercise their adjudicative discretion without fear of intimidation or harassment. Butz v. Economou, 438 U.S. 478, 515-17, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). We determine whether the protections of absolute immunity are accorded to an agency whose functions are sufficiently similar to the judicial process using the "functional approach." Cleavinger v. Saxner, 474 U.S. 193, 201, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (citing Harlow v. Fitzgerald, 457 U.S. 800, 810, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). We must consider whether the actions taken by the official are "functionally comparable" to that of a judge or a prosecutor. Butz, 438 U.S. at 513, 98 S.Ct. 2894.
 
 
 17
 Appellees argue that they are entitled to absolute immunity because they perform quasi-judicial and quasi-prosecutorial functions. Specifically, they assert that as Idaho's medical board and disciplinary subsidiary, they perform functions similar to that of a federal administrative agency's adjudication and that under the reasoning of Butz, they should be accorded the protections of absolute immunity for all conduct alleged in Olsen's complaint. In Butz, the Court outlined several nonexclusive factors that embody characteristics of the judicial process and aid in the determination of whether to grant absolute immunity: "(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) the [agency's] insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." Cleavinger, 474 U.S. at 202, 106 S.Ct. 496 (citing Butz, 438 U.S. at 512, 98 S.Ct. 2894).
 
 
 18
 In Mishler v. Clift, we applied the Butz factors and held that the members of the Nevada medical board are entitled to absolute immunity for their ministerial acts. 191 F.3d 998, 1009 (9th Cir.1999). Mishler was in accord with well-established case law holding medical board officials entitled to absolute immunity for their quasi-judicial and quasi-prosecutorial functions. See, e.g., Wang v. New Hampshire Bd. of Registration in Med., 55 F.3d 698, 702 (1st Cir.1995) (holding that medical board's counsel entitled to absolute immunity for investigation surrounding disciplinary complaint); Pfeiffer v. Hartford Fire Ins. Co., 929 F.2d 1484, 1490-91 (10th Cir.1991) (same); Bettencourt v. Bd. of Registration in Med., 904 F.2d 772, 782-83 (1st Cir. 1990) (holding that board officials are absolutely immune from suit by physician whose license was revoked); Horwitz v. State Bd. of Med. Exam'rs, 822 F.2d 1508, 1515 (10th Cir.1987) (holding that medical board members are entitled to absolute immunity).
 
 
 19
 Here, we must engage in a similar analysis: using the Butz factors, we must determine whether the Board and the BOPD function in a sufficiently judicial or prosecutorial capacity, thus warranting the application of absolute immunity to protect their discretionary independence and shield their decision-making functions. See Butz, 438 U.S. at 515-17, 98 S.Ct. 2894.
 
 
 20
 
 a. Ensuring Performance of Functions without Harassment
 
 
 
 21
 The Board is a self-governing agency charged with the regulation and discipline of state-licensed medical practitioners. Idaho Code § 54-1805. The BOPD is a subcommittee of the Board, with authority to conduct investigations and hearings regarding unprofessional behavior and to take action with respect to licensing. Idaho Code § 54-1806A. In Mishler, we found that immunity for a medical board and its members serves important public interests. 191 F.3d at 1005. Specifically, we found that "[i]n view of the public interest of ensuring quality health care, there is a `strong need' to make certain that Board Members can perform these disciplinary functions without the threat of harassment or intimidation." Id. (quoting Horwitz, 822 F.2d at 1509). Here, as in Mishler, the Board's and the BOPD's functions include disciplining physicians and physician assistants. Indeed, Idaho law specifically grants to the Board the authority "to create a board of professional discipline and to delegate to it its role and authority in the enforcement and supervision of professional disciplinary enforcement...." Idaho Code § 54-1806A. Because "disciplinary proceedings and the revocation of a physician's [or physician assistant's] license are acts that are likely to stimulate numerous damages actions[,]" Mishler, 191 F.3d at 1005, granting absolute immunity ensures that those performing these quasi-judicial functions are accorded protection from "harassment and intimidation." Butz, 438 U.S. at 512, 98 S.Ct. 2894.
 
 
 22
 
 b. Safeguards Reducing Need for Private Damages Actions
 
 
 
 23
 As in Mishler, the Board and BOPD function under a comprehensive set of statutes and regulations, and each is governed by the Idaho Administrative Procedure Act (APA), which contains procedural rules and regulations for state agency activity. See Idaho Code §§ 54-1801, et seq.; Idaho Code §§ 67-5201, et seq.; IDAPA 22.01.03.00 (1998), et seq. Indeed, Idaho regulations set forth procedures to be used in all hearings, which include proper notice, assurances of full disclosure of relevant facts and issues, and opportunities to present evidence and argument. Idaho Code § 67-5242. All orders must be in writing and include findings of fact and statements of available procedures and time limits for reconsideration or administrative relief. Idaho Code § 67-5248(a)-(b).
 
 
 24
 We conclude that these procedures provide the necessary safeguards for parties, such as Olsen, who appear before the Board and BOPD. Olsen argues, however, that the appellees' actions were nonetheless procedurally deficient and their decisions were improperly based on religious motivations. We have previously held, however, that "[i]t is the available procedures, not the manner in which they are exercised in a particular case, that is the critical inquiry for determining whether there are safeguards that reduce the need for private damages actions." Mishler, 191 F.3d at 1006. Given this statutory scheme, we conclude that Idaho law provides procedural safeguards comparable to those accorded by federal law.
 
 
 25
 
 c. Insulation from Political Influences
 
 
 
 26
 As in Mishler, the structure of the Board and "the procedural requirements of their decision-making process show that the Board Members are sufficiently insulated from political influence." Id. at 1007. The Idaho Medical Practice Act, Idaho Code §§ 54-1801, et seq., establishes the Board as part of achieving its purpose of "assur[ing] the public health, safety and welfare in the state by the licensure and regulation of physicians, and the exclusion of unlicensed persons from the practice of medicine." Idaho Code § 54-1802. The law provides that the Board is composed of seven active physicians, two public members, and the director of the Idaho State Police. Idaho Code § 54-1805(2)(a). As we stated in Mishler, the risk that Board members will act out of financial self-interest is diminished by the presence of non-physicians on the Board. 191 F.3d at 1007. The physician members are chosen by the governor from a list of nominees compiled by the Idaho Medical Association, Idaho Code § 54-1805(2)(b), and the public members must have "never been authorized to practice a healing art, [or] had a substantial personal, business, professional, or pecuniary connection with a hearing art...." Idaho Code § 54-1805(2)(c). The BOPD consists of five members appointed and directly supervised by the Board, with power only to make recommendations to the Board. Idaho Code § 54-1806A(1). BOPD members are required to recuse themselves from any proceeding presenting a conflict of interest, Idaho Code § 54-1806A(5), and all formal BOPD hearings must be open to the public. Idaho Code § 54-1806A(7). In addition, under the APA, all agency hearings require notice, full disclosure of facts, and an opportunity to respond and present evidence and argument. Idaho Code § 67-5242. Given the totality of these procedural safeguards, we conclude that the Board, the BOPD, and their respective members are sufficiently insulated from political pressures. See Mishler, 191 F.3d at 1007.
 
 
 27
 d. Remaining Butz Factors: Precedent, Adversariness, and Correctability
 
 
 28
 First, the IDAPA sets forth detailed requirements for indexing precedential agency orders and guidance documents. Idaho Code § 67-5250. Additionally, the Board's proceedings are clearly adversarial, a proposition which is not in dispute. Finally, Idaho law provides a scheme of appeal: all orders must be in writing and must include a reasoned statement in support of the decision, with findings of fact, a statement of available procedures, and the applicable time limits for reconsideration or other administrative relief. Idaho Code § 67-5248. In that regard, any party may file a motion for reconsideration of a recommended order. Idaho Code § 67-5243(3). Each final agency action or order in a contested case is subject to judicial review. Idaho Code § 67-5270. Accordingly, each of the remaining Butz factors is evident.
 
 
 29
 After reviewing Idaho's administrative and procedural scheme for the regulation of medical practitioners in light of the Butz factors, we conclude that the Board, the BOPD, its members, professional staff and counsel function in a sufficiently judicial and prosecutorial capacity to entitle them to absolute immunity.
 
 
 2. Scope of Immunity
 
 
 30
 Our conclusion that appellees' functions are comparable to those of judges and prosecutors and accorded absolute immunity applies only to those actions which are judicial or closely associated with the judicial process. Mishler, 191 F.3d at 1007 (citing Buckley, 509 U.S. at 273, 113 S.Ct. 2606). We must determine, therefore, which of appellees' alleged acts, if any, are not sufficiently connected to their judicial functions to warrant the shield of absolute immunity. Of course, we only need to analyze those actions which are not time-barred, so we will initially apply the statute of limitations and then determine whether the alleged actions fall within the scope of the appellees' absolute immunity. We must then determine if any of those non-immunity-barred, non-time-barred actions amounts to a constitutional deprivation and whether Olsen has put forth facts sufficient to survive a motion for summary judgment.
 
 
 31
 
 a. Statute of Limitations
 
 
 
 32
 In 42 U.S.C. § 1983 actions, we apply the forum state's statute of limitations for personal injury actions. Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir.2001) (citing Wilson v. Garcia, 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). In Idaho, the statute of limitations provides for a limitations period of two years from the date the cause of action accrues. Hallstrom v. Garden City, 991 F.2d 1473, 1476 (1993) (citing Idaho Code § 5-219(4)). "Although state law determines the length of the limitations period, federal law determines when a civil rights claim accrues." Morales v. City of Los Angeles, 214 F.3d 1151, 1153-54 (9th Cir.2000). "[A] claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." TwoRivers v. Lewis, 174 F.3d 987, 991 (9th Cir.1999). In RK Ventures, Inc. v. City of Seattle, we held that in determining when an act occurs for statute of limitations purposes, "the question is when the operative decision was made, not when the decision is carried out." 307 F.3d 1045, 1059 (2002).
 
 
 33
 In RK Ventures, a case concerning a City's prosecution of an abatement action, we determined that the "operative decision" was the City's decision to institute formal abatement hearings. Id. at 1058. We concluded that the City commenced its abatement action either when the City police chief sent a letter to appellants and their counsel giving formal notice of abatement of the public nuisance, or when the City's Examiner's Office sent a letter to the City and appellants advising them of the commencement date and format of the administrative hearing. Id. We held that the City's continued prosecution of the abatement action during the statute of limitations period did not constitute an actionable event because the actual injury was the City's decision to hold an abatement action and its notice to that effect. Id.
 
 
 34
 Here, appellees assert that all of Olsen's claims are barred by the statute of limitations. Specifically, they argue that Olsen's complaint, filed on February 2, 2001, is untimely because her claims accrued on the date of the BOPD's interview, on January 16, 1999, the point at which they assert Olsen would have first become aware of appellees' allegedly discriminatory motivations. Olsen contends that her complaint is timely, asserting that her claims accrued on August 12, 1999, the date on which the Board's decision regarding her license reinstatement became final. In the alternative, Olsen contends that the February 4, 1999 letter proposing to deny the license reinstatement was the operative decision.[5]
 
 
 35
 We hold that Olsen's claim accrued when she received the February 4, 1999 letter notifying her of the Board's proposal to deny her license reinstatement. The letter was "adequately final and represented the [Board's]'official position.'" Id. at 1060 (quoting Del. State Coll. v. Ricks, 449 U.S. 250, 261, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)). Assuming that Olsen received the letter on February 5, 1999, her complaint, which was originally filed on February 2, 2001, is timely. The actions alleged in Olsen's complaint falling outside of the limitations period, however, are time-barred. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).[6] The following actions, as alleged in the complaint, are the only actions that are not barred by the statute of limitations: the February 4, 1999 letter informing Olsen of the Board's intent to deny her license reinstatement; the Board's decision not to hold a hearing; the Board's billing statement to Olsen's attorney for legal fees and costs relating to the public records request; the Board's Final Order denying Olsen's application for reinstatement; and the Board's denial of Olsen's motion for reconsideration on September 10, 1999.[7] Accordingly, we must determine if any of these non-time-barred actions escape the protections of absolute immunity.
 
 
 36
 
 b. Ministerial Actions
 
 
 
 37
 In Mishler, we explained that the scope of quasi-judicial immunity extends only to "those actions that are judicial or closely associated with the judicial process." 191 F.3d at 1007. In this case, we concluded that while the members of the Nevada Medical Board were entitled to absolute immunity, certain conduct did not fall within the scope of absolute immunity. Applying the functional approach, see Cleavinger, 474 U.S. at 201-02, 106 S.Ct. 496, we concluded that the act of responding to inquiries from other medical boards constituted an administrative function and was, accordingly, not protected by immunity. Mishler, 191 F.3d at 1008.
 
 
 38
 We conclude that of the non-time-barred allegations, only the Board's issuance of the billing statement involves functions that are ministerial, rather than judicial or closely associated with the judicial process. Each of the other allegations involves actions by the appellees directly related to their adjudicatory function and the ultimate resolution of the disciplinary dispute at issue. Indeed, the Board and the BOPD are statutorily authorized to resolve disputes arising from the regulation of licensed medical practitioners in Idaho. Idaho Code §§ 54-1806 & 54-1806A. In this case, the underlying disciplinary dispute involved whether, under applicable Idaho regulations, Olsen was entitled to have her license reinstated after its automatic cancellation after her overdose in 1996. The BOPD's letter indicating its intent to deny reinstatement, the Board's decision not to hold a further hearing, the Board's final order denying her license reinstatement, and the Board's denial of her motion for reconsideration were each procedural steps involved in the eventual decision denying Olsen her license reinstatement. Such acts are inextricably intertwined with appellees' statutorily assigned adjudicative functions and are entitled to the protections of absolute immunity.
 
 
 39
 We have previously explained that acts occurring during a disciplinary hearing process clearly fall within the scope of absolute immunity. Mishler, 191 F.3d at 1008. In Mishler, we explained further that "[i]t is the available procedures, not the manner in which they are exercised in a particular case, that is the critical inquiry for determining whether there are safeguards that reduce the need for private damages actions." Id. at 1006. Moreover, as in Mishler, "the acts of [appellees] are no less judicial or prosecutorial because they may have been committed in error." Id. Ultimately, we find that each of these actions is intimately connected to the appellees' statutorily authorized function to adjudicate disciplinary disputes involving the licensing of physician assistants. Compare Horwitz v. Bd. of Medical Exam'rs, 822 F.2d 1508, 1515 (10th Cir. 1987) (according absolute immunity to members of boards exercising authority to summarily suspend professional licenses), and Austin Municipal Secs. v. Nat'l Ass'n of Secs. Dealers, 757 F.2d 676, 697 (5th Cir.1985) (same), with Chalkboard, Inc. v. Brandt, 902 F.2d 1375, 1379 (9th Cir.1990) (denying absolute immunity for state officials who contravened state law in summarily suspended license). In this case, appellees determined that Olsen had failed to follow mandated regulations and therefore had no license to reinstate. Because Olsen had a right to judicial review, see Idaho Code § 67-5270, she could have alleged on appeal that this decision was motivated by religious or personal animus rather than any failure on her part to follow regulations. Though Olsen exercised her right to appeal that decision, she chose voluntarily to dismiss that claim and instead bring suit against appellees. We believe that Olsen's litigation strategy is, therefore, in direct contravention of the policy behind absolute immunity: Absolute immunity aids in the "discouragement of collateral attacks, thereby helping to establish appellate procedures as the standard system for correcting judicial error." Buckles, 191 F.3d at 1136 (quoting Forrester v. White, 484 U.S. 219, 225, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (internal alterations and quotation marks omitted)). By choosing to circumvent established appellate review procedures, Olsen engaged in the very strategy that absolute immunity is intended to counteract and decided that "[t]he decision maker rather than the decision would become the target." Buckles, 191 F.3d at 1136. We refuse to allow such a result in this case.
 
 
 40
 Finally, the only allegation of Olsen's complaint that avoids both the statute of limitations and the protections of immunity involves the Board's billing statement sent to Olsen's counsel for costs and fees incurred with respect to her public records request. We conclude that the billing practices of the Board are not sufficiently comparable to judicial or prosecutorial functions to be accorded the protections of absolute immunity. See Mishler, 191 F.3d at 1008. Indeed, such actions are administrative in nature and are not, therefore, normally associated with the traditional judicial or prosecutorial functions. See id. (holding that the "act of responding to inquiries [was] ... an administrative function entailing examination of records and sending of correspondence"). However, though we find that this action is both ministerial and within the limitations period, we conclude that it cannot support a viable § 1983 claim. We agree with the district court that Olsen "does not allege that she paid the bill, nor does she allege how sending the bill amounts to a constitutional or legal violation under Section 1983." Because there is nothing in this allegation that suggests that Olsen's constitutional rights were violated, it is insufficient to support her § 1983 cause of action.[8]
 
 
 B. Conspiracy Claim Under 42 U.S.C. § 1985
 
 
 41
 To state a claim for conspiracy to violate constitutional rights, "the plaintiff must state specific facts to support the existence of the claimed conspiracy." Burns v. County of King, 883 F.2d 819, 821 (9th Cir.1989). The district court dismissed Olsen's conspiracy claim, holding that her "complaint lacks any facts specific to a conspiracy and the claim will be dismissed for failure to state a claim." We review de novo a district court's dismissal for failure to state a claim. Cervantes v. United States, 330 F.3d 1186, 1187 (9th Cir.2003).
 
 
 42
 Olsen asserts that her complaint provides sufficient evidence of conspiracy by setting forth numerous factual allegations concerning appellees' conduct. Review of her complaint, however, reveals that Olsen has failed to allege sufficiently that the appellees conspired to violate her civil rights. See Karim-Panahi v. Los Angeles Police Dep't., 839 F.2d 621, 626 (9th Cir. 1988). In fact, her complaint is devoid of any discussion of an agreement amongst the appellees to violate her constitutional rights.
 
 
 43
 Olsen asserts also that she should have been allowed to amend her complaint to state facts sufficient to constitute a § 1985 claim. Generally, a district court should allow a plaintiff to amend the pleadings when a § 1985 claim is insufficiently pled. See Gillespie v. Civiletti, 629 F.2d 637, 641 (9th Cir.1980). In this case, however, Olsen cannot amend the complaint to cure the § 1985 defect, because to state a claim for conspiracy under § 1985, a plaintiff must first have a cognizable claim under § 1983. Caldeira v. County of Kauai, 866 F.2d 1175, 1182 (9th Cir.1989). As previously discussed, Olsen's § 1983 claims were properly dismissed. Accordingly, Olsen cannot cure the defects of her complaint to state a cognizable claim under § 1985. The district court's dismissal of that claim was proper.
 
 
 44
 
 C. Free Exercise Claim Under Idaho Code § 73-401
 
 
 
 45
 Finally, Olsen asserts that appellees' actions violated the Idaho Free Exercise of Religion Act, which provides that the "government shall not substantially burden a person's exercise of religion." Idaho Code § 73-402(2). The district court dismissed this state law claim, holding that section 73-401 did not apply retroactively to the conduct alleged in Olsen's complaint because the Act has no language indicating that the Idaho Legislature intended that it was to be retroactively applied to activity occurring before the act went into effect on February 1, 2001.
 
 
 46
 Under Idaho law, statutes are retroactively applied only if "expressly so declared." Idaho Code § 73-101. Olsen urges that the retroactivity of the Idaho Free Exercise of Religion Act is evidenced by the statute's mandate that it "applies to all state laws and local ordinances and the implementation of those laws and ordinances, whether statutory or otherwise, and whether enacted or adopted before, on or after the effective date of this chapter." Idaho Code § 73-403(1) (emphasis added). We conclude that this section is insufficient to meet the clear expression standard of the retroactivity analysis. Rather, we conclude that section 73-403(1) merely establishes that the Free Exercise of Religion Act applies to all state and local ordinances already in existence at the time of its enactment. It does not establish that conduct performed pursuant to those ordinances, though performed prior to the enactment of the Act, falls within its ambit. Accordingly, we affirm the district court's holding that the statute did not apply retroactively to the conduct alleged in Olsen's complaint.
 
 
 CONCLUSION
 
 
 47
 Appellees are not entitled to absolute immunity for all ministerial acts performed during Olsen's license reinstatement process. The only ministerial act alleged in Olsen's complaint that fell within the scope of the statute of limitations does not state a cognizable claim under § 1983. Moreover, Olsen's complaint failed to state sufficient facts to establish a claim for conspiracy under § 1985. Finally, the district court correctly concluded that the Idaho Free Exercise of Religion Act does not apply retroactively to conduct allegedly performed prior to the enactment of the statute. The district court's order dismissing Olsen's complaint is therefore AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 "Pursuant to Idaho Code Section 54-1806(2), the Idaho Board of Medicine is authorized to promulgate rules to govern activities of persons employed as physician assistants by persons licensed to practice medicine and surgery or osteopathic medicine and surgery in Idaho." IDAPA 22.01.03.000 (1993). A physician assistant is "[a] person who is a graduate of an approved program and who is qualified by general education, training, experience, and personal character, and who has been authorized by the Board, to render patient services under the direction of a supervising physician." IDAPA 22.01.03.010.05 (1993)
 
 
 [2]
 IDAPA 22.01.03.010.03 (1993) defines a supervising physician as "[a] person registered by the Board who is licensed to practice medicine and surgery or osteopathic medicine and surgery in Idaho, who is responsible for the direction and supervision of the activities of the physician assistant."
 
 
 [3]
 Pursuant to IDAPA 22.01.037.03 (1996), Idaho required physician assistants to register with the Board. In 1998, the rules changed to require not registration, but application. Accordingly, the rule codified in IDAPA 22.01.037.03, which resulted in Olsen's license to be automatically cancelled in 1996, is no longer in effect. Note, in this regard, that the pre-1998 rules used the term "physician's assistant." In this opinion, we use the term "physician assistant" to be consistent with current terminology
 
 
 [4]
 IDAPA 22.01.03.051.02 (1998) provides: "License shall be renewed annually on July 1 of every year. The Board shall collect a fee of not less than thirty dollars ($30) for each renewal of a license." IDAPA 22.01.03.051.03 (1998) provides: "Failure to renew a license and pay the annual renewal fee shall cause the license to be canceled. However, a license can be renewed up to two (2) years following cancellation by payment of past renewal fees, plus a penalty fee of twenty-five ($25). After two (2) years it will be necessary to file an original application for licensure with payment of the appropriate fee."See also IDAPA 22.01.03.020.02 (1998) (providing that "[i]f more than two (2) years have elapsed since a physician's assistant has actively engaged in practice, reapplication to the Board as a new applicant is required. The Board may require evidence of an educational update and close supervision to assure safe and qualified performance")."
 
 
 [5]
 At oral argument, Olsen's counsel argued that the discrimination against her was latent until the January 9, 1999 interview, and therefore that claims concerning actions that fall outside the statute of limitations are not time-barred. Specifically, Olsen asserts that because such claims could not have accrued until she had reason to know of the alleged discrimination, her non-time-barred claims must include all conduct falling outside of the limitations period as well. Olsen failed, however, to make this contention before the district court or in her briefs before this courtPaladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1164 (9th Cir.2003) ("[W]e ordinarily will not consider matters on appeal that are not specifically and distinctly argued in an appellant's opening brief." (citing Kim v. Kang, 154 F.3d 996, 1000 (9th Cir.1998))). We, therefore, decline to address this claim. We note, in this regard, that because the January 9, 1999 interview predated the operative decision, the February 4, 1999 letter, her latent discrimination argument cannot explain away her failure to file timely those claims involving alleged acts of discrimination of which she was aware.
 
 
 [6]
 Olsen asserts that the "last act rule" salvages her time-barred claims. She asserts that her claims did not accrue until the Board issued its final order denying her application for reinstatement on August 12, 1999, and that this acts pulls into the statute of limitations each of appellees' previous actions. This argument is without merit. The purpose of the "last act rule" is to assure that when a time-barred event causes a continuing effect, the continuing effect is not regarded as the point the claim accrues. Such analysis avoids an improper attempt to salvage a stale claimDel. State Coll. v. Ricks, 449 U.S. 250, 261-62, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) (holding that civil rights claim was time-barred because the decision to terminate employment was outside of limitations period, though the actual termination occurred within the actionable period).
 
 
 [7]
 Olsen's allegation regarding her pending application for a new license is neither ripe for review nor sufficient to constitute a § 1983 claim. Olsen does not dispute that she has failed to complete the application by providing the Board with necessary information regarding her background. Accordingly, the Board's inaction is justified by Olsen's failure to follow administrative procedures. Moreover, unlike the allegations involving the Board's decision not to reinstate her license, here, the Board's inaction on her present application does not involve the same due process concerns and does not rise to a constitutional claim
 
 
 [8]
 Olsen's constitutional claim is not salvaged by our holdingRK Ventures that time-barred acts should be considered "as evidence that conduct falling within the limitations period had an unconstitutional purpose" 307 F.3d at 1050. In that case, we held that "[i]n assessing whether acts occurring within the limitations period are constitutional, we may look to prelimitations period events as evidence of an unconstitutional motive." Id.; see also Anderson v. Reno, 190 F.3d 930, 936 (9th Cir.1999) ("[E]ven if not actionable in and of themselves, untimely claims serve as relevant background evidence to put timely claim in context."), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In this case, however, there is no evidence in the record, either during or before the limitations period, indicating that the Board acted on an unconstitutional motive in sending the billing statement to Olsen.